Our final case for argument today is 24-2351 Regeneron v. Mylan. Mr. Burrell, please proceed. Thank you, Your Honors. May it please the Court, David Burrell on behalf of Regeneron. The Beckton-Dickinson case sets forth an implication or presumption that is frequently and readily rebutted, not an ironclad rule. That presumption does not operate independently of, much less override or supplant the usual rules for construing claims that courts have applied consistently for decades. But counsel, you're here under preliminary injunction rules.  And as the Court said, Appendix 29, there's a substantial question of non-infringement. Amgen does not contain a buffer. And that is a limitation of the claim. Apparently, a buffer is not needed here because of the qualities of the VGF antagonist. And so you're stuck with the existence of a substantial question of non-infringement. And how can you win on the preliminary injunction? The Court's ruling as to non-infringement, by its own terms, depended on a single issue of claim construction. The Court ruled that buffer must be met by a separate ingredient in the accused product from the VGF antagonist, the efflivercept. This Court has ruled repeatedly that that question is a matter of claim construction. And the Court below said so, too. That question, even on a motion for preliminary injunction, is reviewed de novo by this Court. And for example, in the Luminara case that we cite on page 27 of our brief, it's clear that where a denial of a preliminary injunction or grant depends on an erroneous claim construction, that denial or grant has to be vacated. And it has to be reversed. So this is a de novo matter of law for the Court. And there is no decision of this Court, not one that applies the Becton-Dickinson presumption without resolving a matter of claim construction as to the scope or meaning of claims that is raised by the parties. Not a single one. But the Court here did resolve the relevant claim construction, which is, do we need to have a buffer separate from the VEGF antagonist? It didn't go on to do a full-blown construction of buffer, because it had already decided what was material and in dispute, which is, do they have to be separate or do they not? But the question of whether the limitation is separate or overlapping, as the Court phrased it, depends on the meaning of buffer. This Court repeatedly, from the Google Ecofactor case to the linear technology case to Bot 8 to Sketsco, applies the Becton presumption by first looking at what the claim language means. And the Court here did that over 40 pages, going through the Phillips analysis, looking at the claim language, the dependent claims, the specification, the prosecution history. Those 40 pages, respectfully, Your Honor, addressed a different question. What the Court did was, it started with the Becton presumption and says, I'll presume that these are separate limitations, and then asked whether there was a specific disclosure in the specification, such as an example, wherein the VEGF antagonist of Flibercept was serving as a buffer. That gets it exactly wrong, as this Court said in Sketsco. That turns this Court's precedent on its head, because claim construction must begin with the question of what is the ordinary meaning of buffer. And through 40 pages, the District Court never addressed that question. It addressed it previously in the Formicon case and got it right. But by its own admission, on page 78 of the decision, it announced, I am not determining what the meaning of buffer is. So it did not conduct a Phillips analysis of what buffer means, and I think any such analysis would land exactly where we say, which is a buffer is an agent that resists changes in pH by a proton donating or proton accepting group, and thereby includes proteins like a Flibercept. That's the conclusion the Court reached the only time it undertook an actual Phillips analysis in the Formicon case itself. It didn't do it again. And by foregoing that claim construction analysis, it erred. As I read it, but help me try and see it your way, at 78, the only thing that the Court is saying it's not going to go on to do is resolve the dispute as to whether if the VEGF antagonist can be the buffer, if they didn't have to be separate, then there's a dispute as to whether the buffer can be any substance or can only be an excipient. And the Court is saying, I don't have to do that part of the buffer dispute because it's irrelevant, given that I've already decided that they have to be separate anyway. But the decision that they have to be separate must be predicated on an actual Phillips-Forner construction of the plane. There's 40 pages of that. But none of it asks the question, and he never resolved the question of, what does buffer mean? What is the ordinary meaning of buffer? The only time this Court answered that question in West Virginia was in the Formicon case, where it said, in the context of this specification, it says on page 16 of its Formicon decision, the ordinary meaning of buffer is any substance that resists changes in pH. The Court avoided that question in its decision in this case. But the question of whether a separate component is required or not was never raised in Formicon, and the District Court didn't have to consider it there. This issue was not raised with respect to the Beckton-Dickinson presumption. It was raised whether a protein, like a flibrosept, is part of the definition of buffer. That was fiercely disputed and adjudicated in the Formicon case. But nobody said this issue of whether Beckton applies and whether the two things have to be separate. Indeed. And the Court says on page 78 of its opinion here, the Court need not address the proper construction of the term buffer and declines to do so. It never said, here's the ordinary meaning of buffer. There was a dispute about the meaning of buffer below. Amgen's now abdicated its construction here on appeal that tries to read in a negative limitation into the ordinary meaning of buffer. I think I'm having trouble with your argument because Beckton creates a presumption that there are two separate things here. There is, how do you say, is it VEGF? Yes, VEGF or VEGF. OK. So there's VEGF, and then there's a buffer, two separate things. And Beckton says that there's a presumption that that has to be satisfied by two separate things. There are eight examples and 22 embodiments in this spec. And they all use VEGF, and all of them are a flipper CEP. I don't know if I'm saying that right. And all of them are a flipper CEP, and every one of them includes a separate buffer in addition to the flipper CEP. So given that there's a presumption, and given that that's the intrinsic record, why does it matter if a flipper CEP can sometimes function as a buffer, and the district court's construction below in the other case is only that there's overlap? And so why does that matter? The reason it matters is that the question for invoking the presumption in Beckton-Dickinson depends on the ordinary meaning of the claim terms. And the question is, is there overlap between those ordinary meanings? Or is there not overlap? Are they indeed separate? That's the issue that the court addressed in the Skedco case, where, just like in this case, there was no example in the specification there where the pump and the valve were one in the same. They were always separate in the specification. In BOT 8, there was no example in the specification where the fault inspection program and the boot program were one in the same program. But the court in those cases asked a simple question. What is the ordinary meaning of the claim terms? That's the starting basis for any claim construction analysis, even with Beckton-Dickinson. The court didn't do that here. My problem is, even if I start with the court's claims destruction of buffer already adopted, I still see a substantial problem with your infringement analysis. And I don't see why I would overturn the PI under those circumstances, overturn the decision to do that. I think the issue arises, Your Honor, because in cases where, under a proper claim construction analysis, there is some overlap between the two claim limitations at issue. We see that in Canon rubber. We see that in the retractable technology case. And those cases didn't have 28 embodiments, which all required a separate buffer. Look, if I say anything, confidential scream, and I'll make sure it gets stopped immediately and taken off the record. But the amount of flibbersap in the Amgen product is identical to the amount in all of the other products. It's not like they figured out, OK, we'll use the same 40 whatever it is of a flibbersap. But hey, if we ramp it up to 60, it'll also fill the buffer function. It's the same number. And that's the number in all 28 embodiments. So you needed a separate buffer. You didn't have one. No, those embodiments include a separate buffer. But the claims are not limited to that. The ordinary meaning of the term buffer is any substance No, the claims are requiring a buffer. And the default presumption is that buffer is a separate element from the other elements in the claim. That's the default. And you have to overcome that. We have to overcome that, including by, under a traditional Phillips analysis, which the court below conducted, for example, in the Formicon case, if there's overlap between the two claim terms, as there was in Canon Rubber or Retractable Technology. I don't think even Amgen disputes the notion that where two claim terms overlap in scope, the Becton presumption is either inapplicable or overcome. On page 43 of its brief, where it's trying to distinguish the Google versus Ecofactor case and the Retractable Technologies case, what they say there is, well, the claim language suggested that there was some overlap in those two cases. But here, the claim language doesn't explicitly do the meaning of the claims to the person of ordinary skill does it. Can we assume, for the sake of argument, just for a moment, that the district court followed a proper claim construction process? Is there anything in the intrinsic evidence that you point to that would overcome the Becton presumption of separateness? I think the intrinsic evidence is that buffer is recited and claimed broadly in the intrinsic record. It doesn't say a buffer needs to be an excipient. It doesn't say it must be only phosphate. It says it's anything. It says a buffer. It doesn't. The Amgen product doesn't need a buffer because the VEGF antagonist itself has buffering properties. But it isn't a buffer. Well, Your Honor, I believe it is a buffer. But it's a VEGF antagonist. It's a VEGF antagonist, and it's a buffer under the only Phillips analysis the district court ever conducted. It is a buffer. The court looked at the intrinsic record in that case and found that, in view of the specification and the ordinary meaning of buffer, that what it meant was any substance, not just an excipient with a negative limitation, any substance that resists changes in pH by a proton donating or accepting, including proteins like a flip receptor, including histidine-containing proteins. OK, should you save some time for rebuttal, maybe? Yes, Your Honor. Thank you. All right, let's have Mr. Lampkin. Thank you. May it please the court. As a matter of ordinary Phillips claim construction analysis, ordinary understanding, an inventor's decision to list out different elements separately creates a clear implication or presumption that those elements are distinct components of the patent invention. And the district court here does not merely find that the claims separately list out four structures as necessary components, raising the presumption that those separately listed structures are separate. But it went on to find that every indication of meaning in the specification, Regeneron's own representations, the extrinsic record, points exactly the same way, that those four separately listed structures are separate structures. If I could start with the invention's nature. I mean, here that presumption is particularly powerful because this invention is not merely a formulation. It's not merely a formula, a recipe, in essence, that comes due to your ingredients. It takes a known active ingredient, a flip recept, that is no longer patented. And it says, we're going to have a patent because we have stabilized it. We have a stabilizing formulation. And that stabilizing formulation is four ingredients, the flip recept itself, and three additional ones. A skilled artist in looking at this and saying, gee, this is a stabilizing patent for a flip recept, isn't going to read a flip recept and those three additional ingredients to mean a flip recept plus two. You write in your red brief that nothing in the intrinsic record hints that a single component can satisfy multiple recited elements. And that may be true. But is there anything in the intrinsic record that demonstrates that the patentee did not intend to claim the full broad scope of the plain and order ordinary meaning of buffer? Even apart from the presumption that Becton gives, absolutely. There's, I'm going to point to three specific things in the specification. The first, if you look at the specification, it describes the VEGF antagonist separately from the buffer. If you look on page 96 of the record, column six, there's a bunch of lines described. That's not anything like words of exclusion. Why are those not just preferred embodiments? And we know we don't narrow claims to just, you know, the disclosed embodiments. I was actually referring to something different, which is that it describes a flibbersept. It talks about the VEGF antagonist. And it never once says, gee, the VEGF antagonist can be the buffer. And it described buffers. One buffer, actually. It talks about a phosphate buffer. And it never says, gee, the buffer can be the VEGF antagonist. And when it actually talks about the measures, and this is the second point, when you're looking at the concentration measures, it uses two different measures. One for a flibbersept, one for the buffers. So for a flibbersept, it's milligrams per milliliter. For buffers, it's millimoles per liter. And as the district court found on Appendix 40, the clear implication of using those different units of measurement for those two components is that the components are separate and distinct. Now you can convert them. But if you convert one to the other, the inference gets even stronger. Because if you look, none of the listed concentrations ever overlap. So page 47 of the appendix, the district court finds that the highest flibbersept concentration disclosed in the patent, which is 100 milligrams per milliliter, is equivalent to 0.87 millimoles per liter. So that's well below. It's actually a tiny fraction. The lowest concentration buffer disclosed, which is five millimoles per liter. So when you go through, everything points the same direction in that specification. And then we have each of 22 examples, eight embodiments. In each and every one of those, you find that the VEGF antagonist is plus a separate buffer. You go to what everything Regeneron said before it had our formulation. It said the claim is full of structural limitation. It has to have a flibbersept. That's a structure. Organic compound. In the Formicon, I hope I'm pronouncing that right, case, the district court expressly construed the buffer in this very claim that we're talking about. I recognize the Becton separateness dispute was not expressly raised. But the district court's language in the Formicon construction seems pretty definitive of its view as to what on the intrinsic evidence is the only possible correct meaning of a buffer. And it seems entirely inconsistent here. So for example, and I'm sure you know it, but in the Formicon case, the same district judge wrote that a construction that expressly calls out a flibbersept as being able to be the buffer is consistent with the claim language specification and a person of ordinary skills understanding of the term. And in fact, Regeneron's construction, which is the one that was adopted in that case, is the only construction that gives meaning to the dependent language. And it goes on from there. How can both be right? Yeah, so because in that case, the district court flatly didn't consider the Becton presumption because there in Formicon, the accused product had four distinct structures, including a traditional small molecule buffer. Instantane. Exactly, exactly. And so there was no reason to consider whether or not a flibbersept could sort of do dual duty and function as the first limitation and the third limitation. It just wasn't before the court. But courts are allowed to go back and make decisions, and especially when the first one's on a preliminary construction. And in this case, the district court looked at the extrinsic evidence. Extrinsic evidence that Regeneron was providing. And it found, page 8065, or page 66, the evidence does not show that a flibbersept was known or understood to be a buffer in a pharmaceutical composition during the relevant timeframe. So it would not be fair in our case, where the issue's raised, to construe buffer expressly to include a flibbersept as an example because nobody at the time would have understood that. It also found that the POSA at the relevant time would not consider a therapeutic fusion protein like a flibbersept to be a buffer in the context that 865 had. You're not going to put the word of flibbersept into the construction if nobody at the time would have considered a flibbersept to be a buffer. What becomes dispositive here is that there's a big difference between taking something from a construction and saying, well, that construction's broad enough. It includes the sun, the moon, the stars. That construction's broad enough that you could have overlapping things. There might be ingredients that qualify for one in a second. And having something in the patent itself, something in the patent itself that tells skilled artisans, gee, yes, I know. I'm listing four structures separately. And I know that ordinarily means four separate structures. But in this case, that's not what I mean. I mean something different, something that puts them on notice that that's going on. And in every single case in which this court has found that Becton presumption overcome, there's been something in the patent, something in the claims, something in the specification that makes clear to the skilled artisan that although we have separate listings of elements, those separate listings don't require a separate. I think that you're asking for a higher standard right now than what Becton and our cases require. And I'm not sure why, because I don't think you need it. But I do feel like you're asking us to extend beyond what those cases require. I think the answer is, as a matter of fact. I think your answer should be, no, no. I'm not doing that. I think that is the correct answer. And that's where the courts come. Because this is a matter of giving people notice that when you read out four separate structures, unless there's something that overcomes the presumption, the ordinary meaning. Let me give you an example. Suppose in this case, the Amgen product used 300 whatever units they are of the FlivrSEF, right? Instead of the 40. And that a skilled artisan would know if you, by an order of magnitude, increase the amount of the FlivrSEF, it's going to function both as a buffer and as the active ingredient that's necessary. Well, then you would just have a FlivrSEF. It would be exceeding the raw amount that is laid out in the examples in the specification. But a portion of it could be fulfilling the buffer role. And a portion of it could be fulfilling the active ingredient role. In a situation like that, why does a spec have to say anything at all? I wouldn't want to tell a district court it couldn't conclude under those circumstances. Thankfully, as you point out, we don't have anything like that. I know, but the rule of law you just asked for would preclude the example I just gave. And that's why I want this court to be very careful as we're thinking about this. I think the court does not have to go as far as I go. But there just has to be something. You've got to be able to look at the claim. Got to be able to look at the specification. And the artisan who's going to come up with a better, simpler formula, one that's actually more stable, one that has three ingredients than it has to four, has to have something that puts them on notice that even though it recites four separate structures, four structures separately, that doesn't mean four separate structures. There's something that's got to put them notice that three will do. There's absolutely nothing of that sort here. In fact, it's the exact opposite. Anybody who's a formulation scientist and looks and says, oh, we're going to stabilize a flibrosept because we're going to have the afslirosept and we're going to have three additional ingredients, we list them out, they're not going to read that as being a flibrosept plus two ingredients. This is about stabilizing a flibrosept with those three additional structures, not a flibrosept somehow stabilizing itself. That wasn't known. No one knew you could do that until Amgen did it. That takes me back, though, to the Formicon record, and I recognize you're not bound by it. I don't think anyone is arguing it is, but they're the district court looking at this very same patent and the same expert, Dr. Trout, writes, the court notes that the aflirosept protein is also disclosed in the patent, and Dr. Trout explains that a person of ordinary skill in the art would have understood proteins like aflirosept to be buffers. Right, and by the time the district court got a fuller view of the facts, and it came to ours, it made fact findings that just can't be reconciled with that dictum, because it was dictum. They had four structures there. Understood, so he was just wrong there, is your position. I think he just was not correct, but you don't even have to go there, because he just didn't have Becton in front of him, because the issue wasn't presented. When the judge got Becton in front of him, realized, oh, it lists out four structures separately, that means separate structures. But when he got to the extrinsic record and said what would a skilled artisan have known, he specifically found, and this is nowhere identified as clear error on page 65, that a POSA at the relevant time would not, not have considered. You mean a person of ordinary skill speaking English? Yes, I'm sorry, a skilled artisan, I should say. He wrote POSA, but a skilled artisan at the relevant time would not consider a therapeutic fusion protein like aflirosept to be a buffer in the context of the 856 patent, and that's important, because these are formulations for ophthalmic, pharmaceutical formulations. This is something you're putting your eyes, so the notion that, for example, horse blood could have buffering properties in a biological system, or tuna muscle. That's not gonna tell you that aflirosept can be bufferless, because you can make it in a way, which Amgen invented, that ensures that it can, that it doesn't need a separate buffer. Can I ask you to turn to your bond issue for a second? Yes. Go. Oh, okay. So, yes, so the short answer is that, when we briefed the bond issue before this court, Regeneron said flat out that you didn't need to require a bond, because the court can, quote, "'remand to assess Amgen's actual harm "'caused by the injunction.'" I know, but see, here's what I'm worried about. Tulloch, Supreme Court, you familiar with it? Because you guys didn't brief any of this, unfortunately, and you probably didn't brief it, because you're gonna tell me that, basically, it's already admitted that they can get a bond. I get that you're gonna say that, but the Supreme Court and Tulloch, followed by the Second, Third, and Fifth, and Sixth Circuits have all said the bond creates a contract between the parties and the court, and that creates the basis for the damages that would flow therefrom. There was no bond here. I was not on the panel that didn't give you a bond, of judges, there was no bond here. Where does the cause of action come from that entitles you to damages, given that a bond wasn't put into place, and the Supreme Court and Tulloch said the bond is the contract? So the bond requirement can be waived. It's not a requirement, you can waive it. There's a case called Continuum versus Inceps, 873 F Second, 801, admittedly, it's a Fifth Circuit case, and what they did when they told this court that you don't need a bond, the District Court can do it on remand, they waived the bond requirement. I don't suppose you've got any great Supreme Court precedent for me on this. I don't, but remember, this is a matter of equity in terms of ensuring that when you issue an injunction, the person who's a victim of that injunction, when it's mistaken, is not harmed. And they can waive it by saying, you know what, we'll let the District Court do it. Well, according to one Fifth Circuit case, thank you. Yeah, that's what I have, but I don't want to burn too much time on that, frankly, because the central point for us, what we're most concerned here, what we want to make sure is that our product, a better product, which has three ingredients, not four. No, I understand you don't want to waste time on it, but that's what I want to talk about. Okay, that's it. So if you don't want to waste time on it, and you'd like to waive that portion of your brief, feel free to do so. Well, certainly, Your Honor, if it's faster for the court, and it results in a quicker result, and keeps this product on the market, we would be happy to waive that portion of our brief. So you've withdrawn the argument that you seek a remand for a calculation of damages? If it's the court's desire, and you can get to a faster agreement. No, not if it's the court's desire. Have you waived it now? Are you withdrawing it? We will not claim that there is error if the court does not address that and does not remand. Okay. I see that I'm coming to the end of my time here, but I just want to make sure that I'm very clear, that we, it is emphatically our position, contrary to the representation, that the mere possibility of overlap, the fact that there is one ingredient that could do double duty, is not itself enough to overcome the Becton presumption, and that's all they have here. In fact, the possibility of overlap wasn't even known at the time, so I don't know how you can draw an inference, but that's simply not enough, because that would render the Becton presumption a nullity. The only time Becton matters is when you have one ingredient that can do double duty. If you don't have any ingredient that could conceivably do double duty, you don't actually need the Becton presumption. And every time this court has found the Becton presumption overcome, there's been something in the claims, something in the specification, something there that indicates that, even though we've listed out separately, even though that's the ordinary, normal understanding of a list, that you have separately listed items, those are separate items. We mean something different here. There's simply no notice whatsoever in this patent that would tell skilled artisans that's the case. Everything says the opposite, including their representations to the court in Milan, including the fact that you have non-overlapping concentrations, including the fact that concentrations are different measures, including every single thing. Okay, out of curiosity, you seemed very, very eager for as quick a result as you can possibly get. Just why? There's no injunction in place, right? Is your client on the market? Client is on market. So, I mean, you expressed a degree of extraordinary urgency. No, I'm not gonna tell this court that this is... And so I just need to know, I'm trying to get to the bottom of why. If there were a PI in place, I understand why you would have such an urgency. When you have a product on the market that people are relying on, the last thing you wanna do is to be on the market a year, and then have legal uncertainty about whether it stays there, and the people relying on it continue to rely on it. Certainty helps everybody. We're interested in providing life-saving, site-saving products, and making sure people can keep them. And so in this case, we believe that a quicker result is a better result. I mean, a quicker result's a better result in every case. Yes, yes, but... Okay, but there's not something I'm missing. There's no fire under us on this one. We're selling our product, people are benefiting from it, and we're happy with that state of affairs, but we'd like to keep that state of affairs and make it clear. Thank you. Thank you. Okay, some rebuttal time. Just as it did in its brief, Amgen's argument today avoids the plain, ordinary meaning of buffer. They don't really dispute that the plain meaning of buffer to the person of skill in the context of this specification includes proteins like a flibrosept. Under this court's case law, that plain meaning controls absent a disavowal or a redefinition in the specification. That's what Thorner requires. Your Honor asked Amgen's counsel about the recitation and the intrinsic record in this specification, and he went through various portions of the specification. None of them, none of them are asserted to be a disavowal of the plain meaning of buffer that was adjudicated below to include proteins in the Flormicon case, and that the entire record demonstrates includes proteins from dictionary definitions at A9202 and 9220 to articles called proteins as buffers to their own expert's admission at A26323, where he says it was known in the literature that proteins have this buffering capacity and can buffer solutions. One solution, of course, is an ophthalmic formulation like the one in the claim. In the cases applying Becton, one can look to BOT 8, for example, one can look to SCEDCO. There need not be an example or something in the specification that shows overlap or shows double duty. There was no example at all in BOT 8 where the boot inspection program and fault inspection program were one and the same. What did the court do? It looked to the ordinary meaning. It cites cases like Thorner, and it says, is there disavowal here? And if there's no disavowal, then under cases like linear technology and Google versus Ecofactor, the plain meaning applies and can't be narrowed. What Amgen is doing here is using the Becton implication. That's the word that's used in Becton, not presumption, implication. They're using the Becton implication to narrow the claim through a negative limitation. And implications are not enough to remove subject matter from the claims as construed pursuant to their ordinary meaning to the person of ordinary skill. That was never disturbed by the court here. It didn't go back and revisit or change its form of conconstruction or conclude that the plain meaning was something different. What is your best piece of intrinsic evidence that rebuts the Becton presumption here? The ordinary use of the term buffer in the specification and the fact that buffer, for example, is listed separately from excipients. In columns six and seven, it distinguishes buffers on the one hand and excipients on the other. Excipients, as Amgen says, was understood by, per Amgen's argument, to be inactive ingredients. So it's making that distinction in column six and column seven. And as the court found in the form of concase, it's using buffer according to its well-understood meaning to the person of ordinary skill. That is, any substance that resists changes in pH through a proton-donating or accepting group, including histidine-containing proteins like Aflibrisept. Everyone knew that this histidine, whether in free form like in Formicon's product or as part of a protein like Aflibrisept, had this imidazole ring that resists pH changes. Everyone knew that already, so we didn't have to recite phosphate-histidine proteins. We recited phosphate as an example. And as the district court concluded, the only time it ever addressed it, that would be understood to include proteins containing histidine like Aflibrisept. Subject to any more questions? I thank all counsel. Case is taken under submission.